1
2
3
4
5
6
7
8

9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   RICHARD HOWARD KELLY, an                   CASE NO. 04cv807 WQH (BGS)
     individual,
13                                              **ORDER**
                                    Plaintiff,
14         vs.

15   PROVIDENT LIFE AND ACCIDENT
     INSURANCE COMPANY, an insurance
16   company; DOES 1-50,

17                                   Defendants.

18   HAYES, Judge:

19         The matter before the Court is Defendant Provident Life and Accident Insurance

20   Company's Motion for Summary Judgment.  (Doc. # 106).

21                              **BACKGROUND**

22         Plaintiff initiated this action relating to his own-occupation disability insurance policy

23   with Defendant by filing his complaint on April 19, 2004.  (Doc. # 1).  Plaintiff alleged three

24   claims: (1) rescission of an August 2001 settlement agreement ending prior litigation between

25   the parties in this district; (2) breach of disability insurance contracts; and (3) breach of the

26   implied covenant of good faith and fair dealing.  *Id.* at ¶¶ 53-75.  On August 13, 2004, this

27   Court dismissed Plaintiff's claims with prejudice, holding Plaintiff's breach of contract and

28   bad faith claims were barred by the statute of limitations and that Plaintiff's rescission claim

failed to allege sufficient facts to establish undue influence pursuant to *Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123, 130 (1966).  (Doc. # 21 at 5-8).  On October 16, 2007, the United States Court of Appeals for the Ninth Circuit reversed this Court's decision in an unpublished memorandum disposition, holding that the seven factors listed in *Odorizzi* were not the only factors which could support a claim for rescission based on undue influence under California law.  (Doc. # 55 at 5).  The Ninth Circuit also held that if Plaintiff could establish that he is entitled to rescission, this Court should equitably toll the statute of limitations on Plaintiff's breach of contract and bad faith claims.  *Id.* at 7-8.

On remand, Defendant filed an answer (Doc. # 59) and the parties proceeded with discovery.  The Magistrate Judge bifurcated discovery into two phases.  (Doc. # 93, 94).  The first phase was limited to discovery on the rescission claim.  *See id.*  Pursuant to the Magistrate Judge's orders, if Plaintiff's rescission claim survives summary judgment, the parties will then conduct the second phase discovery on Plaintiff's bad faith and breach of contract claim.  *Id.* On October 8, 2009, the Magistrate Judge ordered Defendant to produce its Rule 30(b)(6) witness most knowledgeable about the underlying litigation for a second deposition because the witness was unprepared to answer questions about the prior litigation and settlement at the first deposition.  (Doc. # 102).  On November 4, 2009, Defendant objected to the order.  (Doc. # 103).  On November 30, 2009, Defendant filed its pending Motion for Summary Judgment. (Doc. # 106).  On December 3, 2009, Plaintiff filed a Motion to Continue the Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(f).  (Doc. # 108).  On December 4, 2009, this Court ordered Plaintiff to respond to Defendant's objection to the Magistrate Judge's order.   (Doc. # 110).   On February 2, 2010, the Court overruled Defendant's objection and granted Plaintiff's Motion to Continue the Motion for Summary Judgment.  (Doc. # 122).  The Court ordered Defendant to make its Rule 30(b)(6) witness available for deposition before March 8, 2010 and set a briefing schedule for the Motion for Summary Judgment.  *Id.* at 9.  On April 20, 2010, Plaintiff filed an Opposition to the Motion for Summary Judgment.  (Doc. # 143).  Plaintiff also filed the Declaration of Plaintiff's Counsel, Aaron Markowitz, which describes a dispute over bifurcated discovery and states that

Plaintiff seeks additional discovery concerning Defendant's adjusting practices because Defendant reversed its earlier position that bad faith was irrelevant to rescission and argued in support of its motion that it did not act in bad faith by terminating Plaintiff's benefits. (Doc. # 143-5).  On April 26, 2010, Defendant filed a Reply, objections to some of the evidence Plaintiff submitted with his Opposition, and additional evidence in support of its motion. (Doc. # 153).  On April 30, 2010, Plaintiff filed a Supplemental Response to the motion, objections to the evidence Defendant submitted with the Reply, and responses to Defendant's objections. (Doc. # 155).  On June 18, 2010, the Court held oral argument.  *See* Doc. # 157.

## FACTS

Defendant issued Plaintiff two own-occupation disability insurance policies in the early 1980s which provided a combined benefit of $5,500 per month. (Undisputed Fact # 1, Doc. # 143-7).[1]  At the time he purchased the policies, Plaintiff sold insurance as a General Agent for General American Life Insurance Company.  Kelly Decl., Doc. # 143-4 at ¶ 7.  Pursuant to the disability policies, Plaintiff could claim total disability if he was unable "to perform the substantial and material duties of his occupation" and was "under the care and attendance of a Physician."  Defendant's Ex. A, Doc. # 107-2 at 3; Defendant's Ex. B, Doc. # 107-2 at 18. In May of 1986, Plaintiff began seeing psychologist Russell Gold, Ph.D., who diagnosed Plaintiff with depression, dysthymic disorder, and schizoid personality disorder. (Undisputed Fact # 10, Doc. # 143-7).  Dr. Gold attributed Plaintiff's condition to stress from contentious divorce proceedings.  *Id.*  Plaintiff filed a claim for complete disability in September of 1986. (Kelly Decl., Doc. # 143-4 at ¶ 17).  Defendant accepted the claim and began paying benefits. *Id.*  Plaintiff continued to see Dr. Gold for the thirteen-year period he received disability benefits from Defendant.  (Undisputed Fact # 10, Doc. # 143-7).

In addition to paying benefits of $5,500 per month, in 1986 and 1987, Defendant paid Plaintiff's business expenses, such as rent for his office, salaries of employees, utilities, and

---

[1] The parties submitted separate statements of uncontroverted facts.  The designation "Undisputed Fact" means Plaintiff agreed in his separate statement that the fact is undisputed. The citations for "Undisputed Facts" are to Plaintiff's separate statement, which is Doc. # 143-7.

accounting services.  Plaintiff's Ex. 101 at 737-42.

While Plaintiff was on disability benefits, various insurance companies terminated their relationship with Plaintiff as an agent.  In February of 1989, General American sent Plaintiff two letters warning him that his production for 1988 was insufficient and that if he failed to produce significantly higher commissions in 1989, his general agency would be terminated. Plaintiff's Exs. 5-6 at 11-12.[2]  General American again warned Plaintiff that he was in danger of losing his general agency in April of 1990.  Plaintiff's Ex. 14 at 30.  In April of 1990, Aetna sent Plaintiff a letter terminating Plaintiff's appointment as an agent because Plaintiff had recently done "little or no business activity with the Aetna Life Insurance Company . . . ."  In November of 1992, General American "closed [Plaintiff's] General Agent contract . . . effective November 30, 1992."  Plaintiff's Ex. 25 at 184.  After Plaintiff's general agency was terminated, he could still write General American policies, but he had to go through the General Agent for his local area.  *Id.*  In June of 1993, Jackson National Life informed Plaintiff that it would "be unable to renew [Plaintiff's] contract due to inactivity for the past twelve months."  Plaintiff's Ex. 26 at 185.  In October of 1994, Blue Shield of California terminated Plaintiff's agency because Plaintiff failed to meet "minimum production requirements." Plaintiff's Ex. 31 at 247.

Over the course of Plaintiff's disability claim, Defendant investigated Plaintiff's medical condition and whether Plaintiff had returned to work on multiple occasions.  In February of 1990, Defendant stopped paying Plaintiff benefits for a six month period, stating in a letter to Plaintiff's then attorney Harris Steinberg that Plaintiff failed to file his monthly claim forms.  Defendant's Ex. I, Doc. # 107-2 at 64.  Defendant stated that it had "recently learned information which, in our opinion, shows that not only is Mr. Kelly not totally disabled but, in fact, doing quite well and working in his occupation as an insurance agent."  *Id.* at 65. Defendant stated it would resume payment of benefits "subject of course, to continued proof

_____

[2] Page citations for Plaintiff's Exhibits are to the consecutive pagination in the lower right hand corner of the page, not to the CM/ECF pagination or the internal pagination of the documents.

of disability." *Id.* In response, Steinberg sent a letter which stated:

> Mr. Kelly is not involved in any current work activities. As you know, Mr. Kelly is the principal in an insurance agency and has kept the agency open for purposes of collecting the renewal commissions which he is entitled to for work done in previous years on behalf of several different insurance companies. Additionally the office is being kept open as a result of lease obligations on which Mr. Kelly has personal liability in addition to servicing the accounts of his prior customers. . . .

> Mr. Kelly has not returned to work. He did briefly attempt to resume some of his duties in February of this year, but found himself frustrated, stressed, and unable to resume his previous occupation and duties. . . . Mr. Kelly has, as a courtesy to existing clients, serviced isolated insurance accounts which required conversions of coverage from the term coverage to whole life coverage at the insured's request or in one or two instances [added] additional coverage [] to existing policies . . . .

> Mr. Kelly has advised me that Provident Life recently offered to pay him one-year's worth of disability benefits (60,000) to resolve his claim. Please be advised that Mr. Kelly formally rejects this offer and wishes his benefits to continue as promised under the policy on a "monthly" basis for the remainder of his disability

> Lastly, while you pursue your "investigation" of this claim, I must insist that all monthly disability payments be made promptly and that all past monthly disability payments be brought current forthwith.

Plaintiff's Ex. 18 at 45. Enclosed with the letter, Steinberg sent over a hundred pages of business records showing Plaintiff's transactions during the disability period. *Id.* at 46-162.

In his declaration, Plaintiff states:

> Early in my disability, when I was first contacted by an existing client to make an adjustment to his insurance coverage, I contacted Provident at their local office. I spoke to one of their representatives and explained the situation. I explained that I was out on disability and was collecting benefits on an "own occupation" disability policy. I asked if performing the limited work [of modifying an existing client's coverage, adding coverage, or switching to a new insurance type] would disqualify me for continued benefits. I was told it was not. . . . I have always been open and honest with Provident about the work I was doing.

(Kelly Decl., Doc. # 143-4 at ¶¶ 21-22).

Defendant also contacted Dr. Gold, seeking additional information about Plaintiff's condition. Plaintiff's Ex. 19. In the letter dated October 28, 1990, Defendant revealed it has covertly videotaped Plaintiff's activities "over a period of four (4) separate days between May 23, 1990 and June 28, 1990" and sought Dr. Gold's explanation of "why [Plaintiff's] activities in the videotape make it appear that he leads a normal life and is not disabled." *Id.* at 163-164.

The letter also requested a list of "objective symptoms" of Plaintiff's psychological conditions. *Id.* at 163. In a response dated February 6, 1991, Dr. Gold detailed the history of Plaintiff's case, described Plaintiff's difficulties with interacting with other people, particularly face to face, his social isolation, depression, excessive sleeping, abusive family background, and stress from his divorce, and concluded that Plaintiff "cannot perform a significant number of the usual and necessary responsibilities of an insurance agent." *Id.* at 164-167. As to the videotape, Dr. Gold stated he does not "believe anything in the videotape contradicts the statements made herein." *Id.* at 168. Dr. Gold notes Plaintiff "has always maintained the capacity to perform errands and menial daily functions in order to live autonomously. Had he ever not been able to function at this minimal level, he would have been hospitalized." *Id.*

A report sent by the investigator to Defendant in June of 1990 shows that Plaintiff went to his insurance office once during the four days of surveillance. Plaintiff's Ex. 16 at 33-39. It is not clear how long Plaintiff remained in his office, because ten minutes after Plaintiff arrived at his office, Defendant instructed its private investigator "to terminate the investigation at this time since it did appear Mr. Kelly was at work." *Id.* at 37. Plaintiff was also observed running errands and performing chores during the surveillance period. *Id.* at 39.

In August 1990, Defendant resumed payments after receiving the letter from Steinberg. Kos[3] Decl., Doc. 106-3 at ¶ 13. On December 11, 1990, Dr. Gold submitted a form to Defendant which stated Plaintiff's disability was "permanent and stationary." (Undisputed Fact # 16, Doc. # 143-7). On April 3, 1991, Defendant asked Plaintiff "to submit to an Independent Medical Examination ("IME") by Stephen Stahl, M.D., Ph.D., a psychiatrist who was on the faculty of UCSD Medical School" and sought to send Plaintiff for psychological testing. Kos Decl., Doc. # 106-3 at ¶ 15. Around the same time, Defendant offered to settle the disability claim for $200,000. *See* Plaintiff's Ex. 21 at 172 (Letter from Defendant to Steinberg dated April 22, 1991). Defendant rejected Plaintiff's counteroffer of $431,000. *Id.* On June 7, 1991, Steinberg sent a letter to Defendant asserting further examination of Plaintiff

---

[3] John Kos is Defendant's Director of Long Term Disability. *Id.* at ¶ 2.

would damage his psychological health and was unnecessary.  Plaintiff's Ex. 22 at 174.

However, Plaintiff did submit to the psychological testing on August 14, 1991, and the results

were forwarded to Dr. Stahl on September 11, 1991.  Kos Decl., Doc. # 106-3 at ¶ 16;

Defendant's Ex. K, Doc. # 107-2 at 76.  Dr. Stahl also examined Plaintiff.  Defendant's Ex.

K, Doc. # 107-2 at 76-77.

Dr. Stahl's report concluded Plaintiff was suffering from dysthymia, or low-grade

depression, as well as "mixed personality disorder with schizoidal and passive aggressive

features" at the time of the examination and that Plaintiff had previously experienced a major

depressive episode brought on by his divorce which was then in remission.  *Id.*  Dr. Stahl

concluded Plaintiff was

> temporarily totally disabled at the very least from November of 1990 until the
> time of my  final evaluation on September 25, 1991.  Dating the exact onset of
> his temporary total disability is difficult because of the impossibility of getting
> reliable information from Mr. Kelly.  In the absence of better information, I
> would tend to rely on Dr. Gold's assessment and date the onset of total disability
> to be 1986, when Mr. Kelly stopped working.  Dating the recovery of total
> disability with return to the baseline state of partial long standing disability is
> clearer. Mr. Kelly was already recovering notably from his major depression at
> the time of his first interview with me in May, 1991, but was still temporarily
> totally disabled.  By the time of his final interview, Mr. Kelly was no longer
> totally disabled.
>
> Mr. Kelly is currently able to perform the substantial and material duties of his
> usual occupation.  However, he has no interest in doing so.  In fact, hearing this
> opinion that he is able to work again will undoubtedly anger Mr. Kelly and
> could precipitate various hostile acts towards various parties including himself.
> Mr. Kelly has made vague references to shooting himself if he does not get his
> own way, which is to continue totally disabled indefinitely.  Such implicit
> threats, however, do not change the objective assessment of temporary total
> disability, which are from 1986 to September 1991.

*Id.* at 76-78.

Despite this finding, Defendant continued to pay benefits.  Kos. Decl. Doc. # 106-3 at

¶ 17.  Kos states in his declaration that this was because Defendant learned that "Dr. Stahl had

once been investigated . . . for an alleged impropriety in connection with a professional

publication, Provident chose to forego any action based on Dr. Stahl's IME report.  Again,

given the potential for questions regarding Dr. Stahl's credibility, Provident chose to give

Kelly the benefit of the doubt."  *Id.*

In February of 1995, Provident informed Plaintiff that it had "recently completed a

comprehensive review of your claim and have determined that it will only be necessary for you and your Attending Physician to complete an 'Insured's Supplementary Statement of Claim' form 4 times per year."  Plaintiff's Ex. 36 at 280.  In 1997, however, "Provident . . . began another investigation."  Kelly Decl., Doc. # 143-4 at ¶ 40.  Kos states the investigation revealed Kelly was still licensed to sell insurance and that he had income "for all but two years during the period from 1986 to 1996."  Kos Decl., Doc. # 106-3 at ¶ 20-21.  In May of 1997, Defendant also had a second IME with Dr. Alan S. Bergsma, M.D., a psychiatrist and additional psychological testing.  *Id.* at 22; Defendant's Ex. P, Doc. # 107-2 at 103.

In his report dated May 27, 1997, Dr. Bergsma concluded that Plaintiff was suffering from Dysthymic disorder and a "mixed character disorder with schizoid features." Defendant's Ex. P, Doc. # 107-2 at 118.  Dr. Bergsma concluded that Plaintiff had previously suffered from a major depressive episode from 1986 through 1991 which was in remission at the time of the examination.  *Id.*  Dr. Bergsma states that the "diagnosis of personality disorder refers to a chronic pattern of behaviors which interfere with his ability to function socially and interpersonally [which] also affect his occupational behavior."  *Id.*   Dr. Bergsma concluded that Plaintiff's

> mood disorder does not intrude into his life any more than it did when he was employed as an insurance salesman.  Similarly, his personality disorder with all of its difficulties is a baseline pattern of functioning which has been present throughout his adult lifetime.  There is no more reason to believe that it now would preclude him from functioning in his occupation of insurance salesman than it did in the past. . . .

> Returning to work as an insurance person would be difficult for Mr. Kelly now, just as it was in the past.  He was always more task than people-oriented.  His disability benefits enable him to avoid interpersonal stresses to a large degree.

*Id.* at 118-120.  The report does not state the standard Dr. Bergsma used for determining whether Plaintiff was totally disabled.  *Id.*  Defendant continued to pay benefits after receiving this report.  *See* Defendant's Ex. X, Doc. # 107-3 at 82.

In July of 1997, Defendant sent a field investigator, Lorenz E. Blochl, to Plaintiff's residence.  *See* Defendant's Ex. R, Doc. # 107-3 at 1; Kelly Decl., Doc. # 143-4 at ¶ 40. Plaintiff refused to allow the investigator into his house and gave very short answers to

questions.  *Id.*  The investigator's report commented on Blochl's estimate of the price of Plaintiff's home ($600,000-$700,000), the landscaping, pool, and the make of a car in Plaintiff's garage (a Mercedes).  Defendant's Ex. R, Doc. # 107-3 at 2.[4]  The report also noted that assets, including the house, cars, and Wobegone Enterprises, a company Plaintiff founded, were held in Plaintiff's wife Anna's name, not his own name.  *Id.*  Blochl interviewed Plaintiff's ex-wife Wanda, who stated Plaintiff threatened to go on disability if she filed for divorce, that Plaintiff abused her, that Plaintiff went to Europe with another woman while on disability, and that Plaintiff faked his depression.  Defendant's Ex. T, Doc. # 107-3, 8-9.

Defendant also obtained business records from Plaintiff's former employer, General American Life Insurance Company, which had allowed him to continue writing policies after terminating his general agency in 1992.  Defendant's Ex. U, Doc. # 107-3 at 10-11.  The records provided by General American showed total commissions by Plaintiff's company, Kelly Insurance Services, which changed its name to Wobegone Enterprises in 1997, ranging from approximately $88,000 to $185,000 per year from 1991 through 1998.  *Id.* at 159.  Kos states these records "confirmed for the first time that Kelly was working, and receiving income from activities other than mere 'renewals' and 'sporadic courtesy services' during the entire period of his claimed disability."  Kos Decl. Doc. # 106-3 at ¶ 31.  The records do not state how many transactions Kelly performed in these years or how these sales compare to other agents.  A letter from General American in 1994 informs Plaintiff that as of October, Plaintiff had only met 2.8% of his yearly sales goals.  Plaintiff's Ex. 32 at 248; Kelly Decl., Doc. # 143-4 at ¶ 38.  Plaintiff states that over the course of the thirteen year period he received benefits, he sold 54 policies to 19 clients, "all but two [of whom] were clients that I had prior to going on disability."  Kelly Decl., Doc. # 143-4 at ¶ 48.  Plaintiff states "more than three-quarters of the first year commission income that I earned between 1991 and 1998 came from only one client, which was a client I had before my disability."  *Id.*  After Plaintiff's general agency with General American was terminated in 1992 because of poor sales performance, he was

---

[4] Citation is to the CM/ECF page number, not the internal pagination.  (For the first 148 pages of exhibits, these numbers match.)

assigned to the general agent for his geographical area, Thomas Gore.  Kelly Decl., Doc. # 143-4 at ¶ 37.  All of Plaintiff's work after 1992 went through Gore's office.  *Id.*  Defendant also sent an inquiry to Gore, who stated in response that although he had a business relationship with Plaintiff for "7-8 years," he had "never met [Plaintiff] personally.  We've only spoken by phone."  Plaintiff's Ex. 71 at 399.  Gore stated Plaintiff was generating "3-5 policy sales [per year].  Virtually all are repeat sales to existing customers."  *Id.* at 400.  Gore stated he spoke to Plaintiff "[p]erhaps 10-12 times per year."  *Id.*  Defendant received that letter on February 4, 1999.  *Id.*

In early 1999, Defendant also contacted other insurance companies which had relationships with Plaintiff prior to his disability claim.  CPIC Life Insurance Company responded to Defendant's inquiries by stating Plaintiff and Wobegone Enterprises were on "Inactive Status," and that Plaintiff had not submitted any new business or earned any commissions since 1991.  Plaintiff's Ex. 70 at 381-82.  Safeco Life Insurance Company informed Defendant that Plaintiff and Wobegone were on inactive status and that Plaintiff's agency had been cancelled in April of 1993.  *Id.* at 383.  In response to a similar inquiry, Executive Life Insurance informed Defendant that it had no record on file of Plaintiff and did not do any business with him.  *Id.* at 385.  Guarantee Life Insurance also could not find any record of Plaintiff as an agent and stated that although Wobegone was an agent, "we also have no indication (on our records) that Wobegone Enterprises continues to be active with us."  *Id.* at 388-89.  Massachusetts Casualty informed Defendant that Plaintiff had been on inactive status since January of 1985 and that it had never done business with Wobegone.  *Id.* at 390.  Chubb Sovereign Life Insurance stated it had terminated Plaintiff as an agent in 1995 and had not done business with Wobegone.  *Id.* at 391.

Defendant did not contact Plaintiff's wife to determine her involvement in Wobegone Enterprises.  In a declaration, Plaintiff's wife Anna Kelly states:

> Shortly after we were married [in 1991], Richard gave me his company. . . .
> Since 1991, Richard's association with [the company] has been very limited due
> to Richard's disability. . . . Prior to me obtaining my insurance license [in 2001],
> Richard maintained his license so that we could sell insurance to some of
> Richard's old clients, and occasionally to an acquaintance of mine.

Decl. of Anna Kelly, Doc. # 143-1 at ¶¶ 2-5.

During the investigation, Blochl contacted the San Diego District Attorney's Office, the United States' Attorney's Office, and the FBI to report insurance fraud. Plaintiff's Ex. 67 at 371; Plaintiff's Ex. 68 at 375; Plaintiff's Ex. 75 at 420. A deputy district attorney informed Blochl that "Mr. Kelly should be asked if he in fact has sold policies after his date of disability and whether or not he has an office. Very specific questions about sales, marketing, and prospecting should be asked" and warned Blochl that "the questions on the Insured's Supplementary Statement of Claim form were vague." Plaintiff's Ex. 68 at 375. Defendants never asked Plaintiff these questions. The deputy district attorney also "suggested that the Insured should be examined under oath by Provident attorneys regarding this claim. She indicated that very specific questions about the insured[']s alleged disability and possible insurance related activity should be explored." *Id.* at 376. Defendant never conducted such an interview. In his deposition, Blochl testified that when he investigated Plaintiff and contacted various law enforcement agencies, he was unaware that Plaintiff had ever informed Defendant that he was continuing to provide some services to existing clients, that he was unaware that Plaintiff's attorney had provided Plaintiff's business records to Defendant in 1990, and that he was unaware that Plaintiff had informed Defendant that Plaintiff had initiated some new policies. Blochl Depo., Plaintiff's Ex. 121 at 994-996. Blochl testified in his deposition that this information would have affected his determination of whether fraud had been committed and that this information was the reason the FBI declined to pursue the case after a preliminary investigation. *Id.* at 1000.[5]

On March 9, 1999, Defendant informed Plaintiff that it was sending him for another IME. Plaintiff's Ex. 72 at 403. On April 16, 1999, Dr. Alan Abrams, M.D., J.D., examined Plaintiff. Kos Decl., Doc. # 106-3 at ¶ 33. Dr. Abrams' report states he was asked to address twelve questions provided to him by Defendant, and quotes the questions provided as follows:

---

[5] Although Plaintiff was never charged criminally in connection with the alleged insurance fraud, he was convicted of tax evasion in 2004. (Undisputed Fact # 66, Doc. # 143-7).

"1. Do you believe the insured is making a choice not to return to work, or does a psychiatric impairment prevent the insured from doing so? 2. What psychiatric impairment exists that would prevent the insured from returning to work in insurance sales? 3. Please identify occupation specific restrictions, limitations, and/or skill deficits resulting from the identified psychiatric impairment [?] 4. Would these restrictions, limitations, and/or skill deficits manifest irrespective of the particular setting of the insured's occupation? If not, in what settings could the insured perform his occupation? 5. Are there significant physical complications to the insured's condition? . . . 6. Are there restrictions, limitations, and/or skill deficits resulting solely from the insured's physical condition that predominate those related to psychiatric impairment? 7. Do you believe the insured is receiving care that is appropriate and adequate for the condition causing the psychiatric condition? . . . 8. What is the prognosis under [adequate] care, for the insured to return to work full-time? Part-time? . . . 11. Are the clinical elements of the claim predominantly those of prevention and risk of recurrence or of a present psychiatric impairment? . . ."

Defendant's Ex. W, Doc. 107-3 at 17. Dr. Abrams concluded that Plaintiff has Narcissistic Personality Disorder with "additional features of other personality disorders." *Id.* Dr. Abrams concluded that "[n]either Mr. Kelly's limited capacity for empathy or deeper human relationship, nor other aspects of his personality disorders, are work disabling." *Id.* Dr. Abrams did not state what standard he used to measure whether Plaintiff was disabled. Dr. Abrams based his diagnosis in part on

other documents that strongly suggest that Mr. Kelly is both selling insurance policies, and running an insurance agency, and has been doing that throughout the period of disability, beginning in 1991. It appears he might have been funneling income from Richard Kelly Insurance, Inc. [sic] through his present wife, Anna, to avoid reporting this income to Family Court. If these documents in fact demonstrate that Mr. Kelly is working, this would confirm the conclusion of the two prior IME's that Mr. Kelly has not been disabled since at least 1991.

*Id.* at 18. Dr. Abrams stated "I do not find evidence that Mr. Kelly was ever disabled by a mental illness, during the entire period of claimed disability" and that "[n]on-clinical elements, i.e. malingering, completely dominate the claim." *Id.* at 78, 81.

On August 18, 1999, Defendant sent Plaintiff a letter notifying him that it was terminating his benefits, although it would provide him with benefits through August 16, 1999, which was the date it concluded Plaintiff was not disabled. Defendant's Ex. X, Doc. # 107-3 at 82. The letter informed Plaintiff that he was required to pay his premiums in order to continue coverage under his policies. *Id.* Plaintiff sent a series of letters to Defendant after the termination and Dr. Gold also wrote to Defendant on Plaintiff's behalf. Kelly Decl., Doc. # 143-4 at ¶ 49. In April of 2000, Defendant stated it was reviewing Plaintiff's submissions

1   and would get back to him.  Plaintiff's Ex. 83 at 447.  However, Defendant never responded.

2   Kelly Decl., Doc. # 143-4 at ¶ 49.

3   　　　　In November of 2000, Plaintiff was served with process in *Provident Life and Accident*

4   *Insurance Co. v. Kelly*, No. 00cv2169 H (JFS), the prior litigation before this Court.  *Id.* at 50;

5   *see also* Compl., *Provident Life and Accident Insurance Co. v. Kelly*, No. 00cv2169 H (JFS)

6   (S.D.C.A. Oct. 25, 2000), Defendant's Ex. CC, Doc. # 107-4 at 16.  Defendant Provident, as

7   a plaintiff in that suit, alleged claims for fraud, conspiracy to defraud, breach of the covenant

8   of good faith and fair dealing, rescission, and restitution against Kelly.  *Id.*  Defendant

9   Provident also sued Kelly Insurance Services, Inc. and Wobegone Enterprises, Inc., alleging

10  a cause of action for conspiracy to defraud.  *Id.*

11  　　　　Plaintiff attempted to retain his former attorney, Steinberg, to represent him and the

12  companies, however, Steinberg told Plaintiff that he did not handle defense cases and advised

13  Plaintiff to hire another attorney.  Kelly Decl., Doc. # 143-4 at ¶ 51.  Plaintiff attempted to hire

14  an attorney, but could not afford the fees and could not find an attorney who would take his

15  case on a contingency basis because he was a defendant.  *Id.*  Plaintiff contacted Defendant,

16  seeking a settlement, because Defendant had previously offered Plaintiff $330,000 to surrender

17  the policies.  *Id.* at 52.  Defendant's attorney, Gregory Scarlett, told Plaintiff that he would put

18  the lawsuit on hold while he looked into a settlement.  *Id.*

19  　　　　On April 11, 2001, Plaintiff learned that a clerk's default had been entered against him

20  and the companies and that Defendant was moving for default judgment.  *Id.* at 52.  Plaintiff,

21  proceeding *pro se,* wrote a letter to Judge Huff explaining that he had not responded to the

22  lawsuit because of his conversation with Defendant's attorney.  *Id.* at 53; Defendant's Ex.DD,

23  Doc. # 107-4 at 90.  Plaintiff stated he believed the litigation was on hold.  *Id.*  In the letter,

24  Plaintiff also stated that he did not own either of the corporate defendants, rather his wife Anna

25  did.  Defendant's Ex. DD, Doc. # 107-4 at 91.  At this time, Plaintiff was still under

26  investigation by the FBI, which he found "tremendously upsetting . . . ."  Kelly Decl., Doc. #

27  143-4 at ¶ 54.  Plaintiff did not understand how he could be accused of fraud because

28  "Provident never asked for any additional information" about his "limited work" after

1   Steinberg sent Defendant his work records in 1990. *Id.* at ¶ 55. Plaintiff states "I did not

2   understand how I could lie about something I was never asked about." *Id.*

3       Because Plaintiff was not an attorney, he could not file an answer or oppose default

4   judgment on behalf of the corporate defendants, and Defendant obtained a default judgment.

5   *Id.* at ¶ 56. Although Plaintiff's wife, not Plaintiff, was the registered agent for service of

6   process, she was never served. Decl. of Anna Kelly, Doc. 143-1 at ¶ 5. Plaintiff's wife states

7   in a declaration that the default judgment

8       put a tremendous financial strain on Richard and I. With Richard unable to work,
        I needed to make money to support us both. I counted on the income from my
9       insurance sales, including the residual commissions flowing through Wobegone,
        in order to make ends meet. When Provident entered default against my
10      company, it took away this source of income entirely.

11   *Id.* at ¶ 8. After the default judgment, Plaintiff began drinking heavily. Kelly Decl., Doc.

12   # 143-4 at ¶ 58. Plaintiff's wife states that his condition worsened after Defendant cut off

13   Plaintiff's disability benefits and during the lawsuit and that at one point, she discovered he

14   had been researching suicide. Anna Kelly Decl., Doc. # 143-1 at ¶ 7. On July 2, 2001 and July

15   5, 2001, Plaintiff and Defendant's attorney attended an early neutral evaluation conference

16   before the magistrate judge. (Undisputed Fact # 55, Doc. # 143-7). Plaintiff settled his case

17   with Defendant, giving up his claim for disability benefits in exchange for Defendant agreeing

18   to dismiss the lawsuit and "giving up its judgment against Anna's company." Kelly Decl., Doc.

19   # 143-4 at ¶¶ 60-62. The settlement agreement was signed by both parties on November 21,

20   2001. (Undisputed Fact # 61, Doc. # 143-7). Plaintiff states he signed the settlement

21   agreement "because I did not have the mental or emotional capacity to engage in the

22   conflictual situation that Provident had created. I did not sign the agreement because it was

23   what I wanted to do, but because I could not resist Provident's pressure." Kelly Decl., Doc.

24   # 143-4 at ¶ 62.

25       Plaintiff submitted the declaration of Dr. Lynn Ponton, M.D., a Professor of Clinical

26   Psychiatry at the University of California, San Francisco, who reviewed Plaintiff's medical

27   records and the records of the three IMEs with Defendant's selected doctors. Ponton Decl.,

28   Doc. # 143-3 at ¶¶ 1, 7. Based on her review of the records, Dr. Ponton offers her opinion that

Plaintiff suffers from Avoidant Personality Disorder with schizoid features. *Id.* at ¶ 9. Dr. Ponton states "Avoidant Personality Disorder is often characterized by shifts in the level of avoidant behavior depending on the level of conflict associated with certain interpersonal relationships. *Id.* at ¶ 12. Dr. Ponton states that Plaintiff's condition creates "undue susceptibility to [] pressure," such as the pressure that Defendant's investigations, the prior lawsuit, and the investigations of alleged insurance fraud by various law enforcement agencies would create. *Id.* at ¶ 48. Under this pressure, given Plaintiff's diagnosis, "[h]is depression and social avoidance would have been at an all-time high" at the time of the settlement. *Id.* at ¶ 56.

Dr. Ponton also criticizes the three IME evaluations performed at Defendant's request. *Id.* at ¶¶ 63-65. Dr. Ponton opines that the September 27, 1991 report by Dr. Stahl is deficient in that it finds

> that Richard is no longer disabled after September 25, 1991, but provides no analysis of the substantial and material duties of Richard's occupation as an insurance broker/general agent for General American – which includes extensive marketing and solicitation of new business – or why Dr. Stahl believes that Richard can engage in those activities on a reasonably continuous basis.

*Id.* at ¶ 63.

As to Dr. Bergsma's 1997 conclusions, Dr. Ponton opines

> I believe the more accurate diagnosis is Avoidant Personality Disorder with schizoid features. . . . [G]iven this more accurate diagnosis, I am critical of Dr. Bergsma's opinion that Richard is not totally disabled from performing the substantial and material duties of his former occupation as an insurance agent because he is at his affective baseline. Due to the stress created by interpersonal difficulties, and the effect the stress has on Richard's dysthymic disorder – leading to episodes of major depression – Richard's emotional state varies based on stress and conflict

and would worsen if Plaintiff returned to work. *Id.* at ¶ 64.

Dr. Ponton criticizes Dr. Abrams's 1999 conclusions as well, noting Dr. Abrams used an outdated test which had been performed on Plaintiff in 1986 rather than more recent psychological testing performed in 1991. *Id.* at 65. Dr. Ponton notes that Dr. Abrams requested this testing from Defendant, but Defendant never provided it. *Id.* Dr. Ponton opines that Dr. Abrams's conclusion that Plaintiff was malingering was linked to his opinion that

Plaintiff has Narcissistic Personality Disorder, which in turn was based on flawed methodology and limited information. *Id.* Dr. Ponton notes that "Dr. Abrams seems to have completely ignored the valid results of the 1997 Millon Clinical Multiaxal Inventory-III (MCMI-III)" in which "Richard scored on the very low end for narcissistic personality pattern . . . ." *Id.* Dr. Ponton opines this score "negates the diagnosis that Richard is suffering from narcissistic personality disorder causing him to malinger." *Id.* Dr. Ponton notes the same test supports her conclusion that Plaintiff has Avoidant Personality Disorder based on other subscores. *Id.* Further, Dr. Ponton opines that Dr. Abrams's diagnosis "is centered on the presumption that Richard is deceitful" and that Plaintiff had lied to Defendant about his work activities. *Id.* Dr. Ponton continues

> [t]he letter from Harris Steinberg [which informs Defendant about Plaintiff's work activities] is conspicuously missing from the list of documents that Provident provided to Dr. Abrams. . . . Moreover, Dr. Abrams specifically asks Provident for additional information, including "Records from the General American Life Insurance Company covering 1986 to 1991"

which Defendant failed to provide. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quotation omitted). "Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing

party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation omitted).

"In ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quotation omitted); *see also DiRuzza v. County of Tehama*, 206 F.3d 1304, 1314 (9th Cir. 2000) ("For purposes of summary judgment . . . , we must presume the facts to be those most favorable to the non-moving party."); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (The nonmoving party's declaration or sworn testimony "is to be accepted as true . . . . [The non-movant's] evidence should not be weighed against the evidence of the [movant]."). At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035-36 (9th Cir. 2005) ("The district court ... improperly dismissed Dominguez's allegations as consisting of nothing more than 'self-serving statements in her own deposition and affidavit.' Such observations go to whether Dominguez is credible, a determination that is exclusively within the province of the factfinder at trial, not the district court on summary judgment . . . ."). "But the non-moving party must come forward with more than the mere existence of a scintilla of evidence. Thus, 'where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Miller*, 454 F.3d at 988 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper." *Id*. (citation omitted).

## ANALYSIS

### I.       Rescission of the Settlement Agreement

Defendant contends that the settlement agreement and general release is binding and

cannot be rescinded because there was no fraud, duress, or undue influence. (Doc. # 106-1 at 21-22). Defendant contends Plaintiff cannot establish undue influence because there is no fiduciary relationship between an insurance company and an insured. *Id.* at 22. Defendant contends that Kelly cannot establish undue influence because "there is no evidence that Provident's counsel engaged in any specific coercive behavior during the settlement negotiations." *Id.* at 23. Defendant contends that the settlement agreements "spanned several months," allowing Plaintiff to review the documents thoroughly, think over the decision, and to consult with an attorney if he so chose. *Id.* Defendant contends that Kelly initially raised the issue of settling the case in a letter sent to Judge Huff on May 10, 2001. *Id.* at 24. Defendant contends that there is no evidence of duress based on mental incompetence because Plaintiff is not incompetent. *Id.* at 25. Defendant contends there is no evidence of economic duress because Plaintiff "continued generating hundreds of thousands of dollars in insurance commissions." *Id.* Defendant contends any bad faith in terminating Plaintiff's benefits and suing him cannot be the basis for rescission, "[o]therwise, it would never be possible to achieve finality in the settlement of a case where bad faith is alleged." *Id.* at 26.

Plaintiff contends that there is a genuine issue of material fact as to whether Plaintiff's agreement to settle the prior litigation was obtained by undue influence or duress. (Doc. # 143 at 14-16). Plaintiff contends that a bad faith threat to breach a contract or withhold a payment can be the basis for rescinding a contract due to economic duress. *Id.* at 15. Plaintiff contends that Defendant's decision to terminate benefits and sue Plaintiff and Plaintiff's wife's business was made in bad faith. *Id.* at 16. Plaintiff contends there was no legal basis for naming Plaintiff's wife's company as a defendant in the original lawsuit. *Id.* Plaintiff contends that terminating his benefits and initiating the lawsuit in bad faith constitutes taking unfair advantage of Plaintiff's mental illness. *Id.* Plaintiff contends that he was unduly susceptible to pressure from Defendant to settle because of his mental illness and because he was dependent on his disability benefits. *Id.* at 19-23. Plaintiff contends Defendant's bad-faith refusal to pay his benefits, coupled with his undue susceptibility, resulted in undue influence. *Id.* Plaintiff contends that a reasonable jury could find that the settlement agreement should

therefore be rescinded. *Id.* at 24. Plaintiff contends that there is a genuine issue of material fact as to whether a confidential relationship existed between Plaintiff and Defendant as a result of Defendant's access to private information about Plaintiff, Plaintiff's reliance on the policy payments, and Plaintiff's weakness of mind. *Id.* Plaintiff contends that Defendant took advantage of their confidential relationship by suing Plaintiff, knowing that Plaintiff was unable to defend himself against the suit due to his mental health problems. *Id.* at 25. Plaintiff contends a jury could find that the agreement should be rescinded on this basis. *Id.*

In its Reply, Defendant contends the Court should not credit Plaintiff's sworn statement that Defendant was aware that Plaintiff continued to do limited insurance sales because "[g]iven [Plaintiff's] conviction of a felony involving honesty, his credibility is in issue." (Doc. # 153 at 2). Defendant contends that Plaintiff "does not explain whether his reduced sales activity was simply a choice he made to reduce his work level in order to receive non-taxable disability benefits while continuing to receive substantial income in the form of hidden insurance commissions." *Id.* at 3. Defendant contends Plaintiff falsely reported his income during his divorce proceedings. *Id.* Defendant contends Plaintiff relies on evidence of wrongdoing by Defendant in other cases related to other insureds with no evidence that Defendant used the same practices in Plaintiff's case. *Id.* Defendant contends that Plaintiff's statement that he was distraught and contemplated suicide after receiving the letter denying further benefits in August of 1999 "is at odds with [his] admission that he took trips to Europe in January 2000 and again in September 2000." *Id.* at 5. Defendant contends there is no evidence that it sued Plaintiff to force him to give up his policies. *Id.* Defendant contends Plaintiff "does not explain whether" he transferred his interest in his business to his wife in order "to conceal income generated by Wobegone from his former wife Wanda, from Provident, and from the IRS." *Id.* at 6.

Pursuant to California Civil Code § 1575,

Undue influence consists:
1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;
2. In taking an unfair advantage of another's weakness of mind; or,
3. In taking a grossly oppressive and unfair advantage of another's necessities

or distress.

A seminal California appellate case defined undue influence as follows:

> [u]ndue influence . . . is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. The hallmarks of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion. In this sense, undue influence has been called overpersuasion."

*Odorizzi*, 246 Cal. App. 2d at 130. If the party seeking to rescind a contract is a "person of subnormal capacities," even subjecting them to "ordinary force" may constitute undue influence. *Id.* at 132.

*Odorizzi* lists seven factors which "generally accompany" overpersuasion:

> (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys. If a number of these elements are simultaneously present, the persuasion may be characterized as excessive.

*Id.* at 133. Although *Odorizzi* states these factors are generally present, the Ninth Circuit's previous ruling in this case states "[t]he *Odorizzi* list was not described as exhaustive. Some contracts might be formed through undue influence even if most or all of the *Odorizzi* factors are absent." (Doc. # 55 at 5). In *Keithley v. Civil Service Bd. of the City of Oakland*, 11 Cal. App. 3d 443, 451 (1970), a California Court of Appeals made the same point: "[i]ndeed, there are no fixed definitions or inflexible formulas. Rather, we are concerned with whether from the entire context it appears that one's will was overborne and he was induced to do or forbear to do an act which he would not do, or would do, if left to act freely." The same opinion notes "direct evidence of undue influence is rarely obtainable and, thus the court is normally relegated to determination by inference from the totality of facts and circumstances." *Id.*

At least one California appellate decision addresses mental illness as a form of "weakness of the mind." *See Smalley v. Baker*, 262 Cal. App. 2d 824, 834 (1968). In *Smalley*, the court held that a manic depressive man was competent to enter a contract, but that his mental illness was a "weakness of the mind" pursuant to California Civil Code § 1575 (2)

because his "judgment was affected." *Id.* at 836.  The court explained that "the lesser weakness of the mind [which does not render a party incompetent] referred to in section 1575 need not be long lasting or wholly incapacitating, but may consist of such factors as a lack of vigor due to age, physical condition, emotional anguish, or a combination of such factors." *Id.* at 835.  However, Smalley ultimately lost because there was "no claim or showing that Baker knew or was aware of Smalley's mental illness, or that he took advantage of such illness so as to bring Civil Code section 1575 into play." *Id.* at 836.

Plaintiff's statements, Plaintiff's wife's statements, the records of a long period of psychological counseling, the opinion of psychologist Russell Gold, Ph.D., the opinion of psychiatrist Dr. Lynn Ponton, M.D.,[6] and the fact that Defendant paid Plaintiff disability benefits for thirteen years could lead a reasonable jury to conclude that Plaintiff was suffering from mental illness which amounts to "weakness of the mind" under California law.  Although Defendant disputes Plaintiff's diagnosis, viewed in the light most favorable to Plaintiff, this evidence could lead a reasonable jury to conclude that Defendant knew that Plaintiff was unusually susceptible to pressure.

The Court must next examine whether there is evidence that could lead a reasonable jury to determine that Defendant took unfair advantage of Plaintiff's weakened state of mind. Although Defendant contends the Court should only consider the settlement negotiations, the Court finds that the appropriate inquiry is broader.   The ultimate question is "whether from the *entire context* it appears that [Plaitiff's] will was overborne." *See Keithley*, 11 Cal. App.3d at 451 (emphasis added).   In this case, the "entire context" of the settlement agreement includes Defendant's investigation of Plaintiff's claim, Defendant's termination of Plaintiff's benefits, Defendant reporting that Plaintiff had committed insurance fraud to various law enforcement agencies, and Defendant suing Plaintiff. The Court must determine whether there

---

[6] Defendant contends Dr. Ponton is not qualified as an expert and lacks sufficient foundation for her opinions.  The Court finds that Dr. Ponton's education and experience qualify her as an expert in psychiatry and that Dr. Ponton's review of the record in this case is a sufficient basis for her opinions about Plaintiff's condition and about the validity of Defendant's IME examinations.  However, the Court finds that Dr. Ponton's opinions about Defendant's motivation for terminating Plaintiff's benefits and for suing Plaintiff are inadmissible as outside the scope of her expertise.

1   is sufficient evidence in the record, viewed in the light most favorable to Plaintiff, that a jury

2   could find that Defendant acted in bad faith in its investigation and subsequent termination of

3   Plaintiff's benefits and by suing Plaintiff in order to take advantage of Plaintiff's weakened

4   state of mind.   This determination requires an examination of California law on own

5   occupation disability insurance policies and bad faith termination.

6         Under California law, own occupation insurance policies define total disability not as

7   "'an absolute state of helplessness but means such disability as renders the insured unable to

8   perform the substantial and material acts necessary to the prosecution of a business or

9   occupation in the usual or customary way.'" *Hangarter v. Provident Life and Accident Ins. Co.*,

10  373 F.3d 998, 1006 (9th Cir. 2004) (quoting *Erreca v. Western States Life Ins. Co.*, 19 Cal. 3d

11  388 (1942)).   Regardless of the definition of "total disability" in an own occupation insurance

12  policy, "California law *requires* courts to deviate from the explicit policy definition of 'total

13  disability' in the occupational policy context."   *Hangarter*, 373 F.3d at 1006.

14        Under California law, "[t]he fact that the insured may do some work or transact some

15  business duties during the time for which he claims indemnity for total disability or even the

16  fact that he may be physically able to do so is not conclusive evidence that his disability is not

17  total, if reasonable care and prudence require that he desist."   *Id.* at 1007 (citation omitted).

18  If an insured can perform the duties of his occupation intermittently, but cannot do so in a

19  "continuous, normal" way, the insured is totally disabled under California law.   *Id.* at 1008.

20  An insured's income is irrelevant to the disability determination.   *Id.*   "[T]he magnitude of [the

21  insured's] enterprise and his income therefrom . . . have *no proper place* in the determination

22  of whether [the insured] is totally disabled [because such insurance] *does not insure against*

23  *loss of income*."   *Id.* at 1009 (citation omitted).

24        In determining whether an insurer acted in bad faith by denying coverage, the fact-

25  finder must determine whether the denial was reasonable.   *Id.* at 1010 (citing *Amadeo v.*

26  *Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002)).   If there was a genuine

27  dispute as to whether the insurer was required to make payments, a court may find as a matter

28  of law that the insurer did not act in bad faith.   *Hangarter*, 373 F.3d at 1010.   However, if the

insurer's investigation of a claim was biased, even if experts stated the insured was not totally disabled, a fact finder may conclude that any dispute over coverage was not genuine and that the insurer acted in bad faith. *Id.* (citing *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001)).

> An insurer's bias may be shown through the following factors:
> (1) The insurer may have misrepresented the nature of the investigatory proceedings;
> (2) The insurer's employees lied in depositions or to the insured;
> (3) The insurer dishonestly selected its experts;
> (4) The insurer's experts were unreasonable; or
> (5) The insurer failed to conduct a thorough investigation.

*Hangarter*, 373 F.3d at 1010. Under California law, evidence of failure to conduct a thorough, fair, and unbiased investigation must be submitted to the finder of fact to determine whether the evidence establishes the insurer acted in bad faith. *Id.*

Lorenz Blochl, Defendant's field investigator, testified that he was unaware that Plaintiff had ever disclosed working in any capacity, and that knowing about Plaintiff's previous disclosures would have affected his determination that Plaintiff had committed fraud. *See* Bloch Depo., Plaintiff's Ex. 121 at 994-96, 1000. Blochl further testified that the prior disclosures were the reason the FBI declined to pursue the case. *Id.* A reasonable jury could conclude that Defendant presented a skewed or incomplete version of the facts to law enforcement agencies through Blochl, who was unaware of Plaintiff's previous disclosures about his work activities, in order to put pressure on Plaintiff to drop his insurance claim. *See* Bloch Depo., Plaintiff's Ex. 121 at 994-996.

Despite the suggestion of the deputy district attorney that Defendant should ask more specific questions in order to establish whether Plaintiff was committing fraud, Defendant failed to ask Plaintiff directly about his work activities after 1991. *See* Kelly Decl., Doc. # 143-4 at ¶ 55; Plaintiff's Ex. 68 at 375. Viewing this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that a jury could find that this was an intentional omission to make it appear that Plaintiff was withholding information he was never asked to disclose. Further, Defendant's failure to ask these questions itself may show bias under California law. *See Hangarter*, 373 F.3d at 1010.

A reasonable jury could conclude that failure to ask direct questions about Plaintiff's work activities prior to terminating benefits shows that Defendant "failed to conduct a thorough investigation." *See id.*

In conducting the first IME evaluation in 1991, Dr. Stahl failed to apply the correct standard in determining whether Plaintiff was disabled. *See* Defendant's Ex. K, Doc. # 107-2 at 76-78. Dr. Stahl determined that Plaintiff was "able to perform the substantial and material duties of his usual occupation," rather than determining whether Plaintiff was "unable to perform the substantial and material acts necessary to the prosecution of a business or occupation *in the usual or customary way,*" as is required pursuant to *Hangarter*, 373 F.3d at 1006. A reasonable jury could find that Defendant's expert's application of the wrong standard in evaluating Plaintiff's disability shows bias in Defendant's investigation. Further, despite Dr. Stahl's opinion that Plaintiff was not disabled, Defendant informed Plaintiff that it had "completed a comprehensive review of" the claim and would continue to pay benefits. Plaintiff's Ex. 36 at 280. A reasonable jury could conclude based on this fact that Defendant knew that the evaluation was flawed and would not hold up as a justification for terminating benefits.

In conducting the second IME evaluation, Dr. Bergsma does not state the standard he used for determining that Plaintiff was not disabled. *See* Defendant's Ex. X, Doc. # 107-3 at 82. A reasonable jury could find that failure to state the standard by which he determined that Plaintiff was not disabled shows that Dr. Bergsma's evaluation was not sufficiently thorough and that Defendant cannot rely on it to establish a genuine dispute as to whether Plaintiff was disabled.

As for the third IME evaluation, there are facts in the record which could lead a jury to conclude that Defendant failed to provide Dr. Abrams with all of its records of prior testing on Plaintiff, despite the doctor's request for the records, and failed to inform the doctor that Plaintiff had previously disclosed engaging in limited work activities. *See* Defendant's Ex. W, Doc. # 107-3 at 71. A reasonable jury could find that these omissions were intentional and resulted in a biased conclusion that Plaintiff was not disabled. Additionally, according to Dr.

Ponton, Dr. Abrams disregarded test results from the 1997 IME which show a very low score for "narcissistic personality pattern," which rules out Dr. Abrams' diagnosis of Narcissistic Personality Disorder. *See* Ponton Decl., # 143-3 at ¶ 65. Based on this fact, a reasonable jury could find that Dr. Abrams' diagnosis was unreasonable. Dr. Abrams does not state what standard he used to determine whether Plaintiff was disabled. Dr. Abrams appears to have assumed that *any* work activity by Plaintiff would indicate that he is not disabled under the terms of his policy, which is incorrect under California law. *See* Defendant's Ex. W, Doc. # 107-3 at 71, 77. Dr. Abrams also focuses on the amount of income Plaintiff may have received while on disability, rather than whether Plaintiff could work full-time as an insurance salesman "in the usual or customary way." *See id.* at 76-77. If Defendant failed to inform its expert of the correct standard or the expert failed to apply the correct standard, a reasonable jury could find that Defendant failed to conduct a thorough investigation before terminating benefits.

Defendant also appears to have directly relied on evidence of Plaintiff's income in determining that he was not totally disabled, rather than on evidence of the extent of his work activity, which is improper as a matter of California law. *See Hartanger*, 373 F.3d at 1009. When Defendant terminated Plaintiff's benefits, contacted law enforcement agencies, and sued Plaintiff, it was in possession of evidence that Plaintiff's activities were limited to "generating 3-5 policy sales [per year]" which were "virtually all [] repeat sales to existing customers." *See* Plaintiff's Ex. 71 at 399 (letter from Thomas Gore, General Agent of General American, received by Defendant Feb. 4, 1999). A reasonable jury could conclude that Defendant applied the wrong standard for determining whether Plaintiff was disabled, which could amount to bad faith under California law.

There is evidence in the record which, viewed in the light most favorable to Plaintiff, could lead a jury to conclude that, despite knowing that Plaintiff was mentally ill, Defendant terminated Plaintiff's coverage in bad faith after conducting a biased investigation, contacted law enforcement agencies to instigate an investigation of Plaintiff for the purposes of harassment and sued Plaintiff for the return of all benefits without a valid basis for doing so in order to take unfair advantage of Plaintiff's weakness of mind. Although Defendant points

out that none of the *Odorizzi* factors are present, this is not dispositive, as the Ninth Circuit previously ruled.  The *Odorizzi* list of factors is not exclusive, and under California law, all of the circumstances surrounding contract negotiations should be examined to determine whether a party to a contract engaged in "overpersuasion." *Keithley,* 11 Cal. App. 3d at 451.  If a jury determined that Defendant took these actions in bad faith in order to pressure Plaintiff to surrender his benefits via a settlement agreement, it could find that Defendant "took unfair advantage of [Plaintiff's] weakness of mind," allowing rescission of the settlement agreement for undue influence.   Defendant's motion for summary judgment on Plaintiff's rescission claim is denied.

## II.        Federal Rule of Civil Procedure 60

Defendant contends that Plaintiff's claims are barred by Federal Rule of Civil Procedure 60(b) because more than one year has passed since the dismissal of Plaintiff's previous suit.  (Doc. # 106-1 at 27).   Defendant contends that Plaintiff cannot establish that a grave miscarriage of justice would occur if he is not permitted to pursue this litigation despite the delay. *Id.*

Plaintiff contends Rule 60(b) would not prevent rescission of the settlement agreement because he is entitled to rescission as a matter of substantive state law which cannot and has not been modified by the Federal Rules of Civil Procedure.  (Doc. # 143 at 26).  Plaintiff contends that modifying the applicable state substantive law would go beyond the authority conferred in the Rules Enabling Act. *Id.* at 27.  Plaintiff contends that rescission would require placing Plaintiff back into the position he was in before he entered the contract, which requires both tolling the statute of limitations and permitting this lawsuit to proceed. *Id.* at 28.  Finally, Plaintiff contends that even if the Court finds that Rule 60(b)—rather than state law on remedies—controls, Rule 60(b) allows Plaintiff to "be relieved of the judgment in the underlying litigation" due to fraud on the court and a grave miscarriage of justice. *Id.* at 28-29.

Pursuant to Federal Rule of Civil Procedure 60(b), a "court may relieve a party . . . from a final judgment . . . for the following reasons:

    (1) mistake, inadvertence, surprise, or excusable neglect;
    (2) newly discovered evidence that, with reasonable diligence, could not have

been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

A motion brought under Rule 60(b)(1), (2), or (3) must be brought within one year of the judgment, whereas under the other provisions, the motion "must be made within a reasonable time . . . ." Fed. R. Civ. P. 60(c). Relief may only be obtained pursuant to the other provisions if a motion is brought "within a reasonable time . . . ." *Id.* Relief under Rule 60(b)(6) is only available if none of the other categories apply and may only be granted in  extraordinary circumstances. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988); *Gonzales v. Crosby*, 545 U.S. 524, 535 (2005).

Pursuant to Rule 60(d), the other provisions of Rule 60 "do not limit a court's power to [] entertain an independent action to relieve a party from judgment . . . ." In an independent action, a court may only generally reverse if allowing the judgment to stand would be a "grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 46 (1998). If a jury finds that Defendant terminated Plaintiff's disability benefits, sued him, and reported him to law enforcement agencies in bad faith, allowing the prior judgment to bar this suit would be a grave miscarriage of justice.

Additionally, if "there is a substantive right as a matter of state law to have a judgment reopened," the substantive state law would prevail over the federal procedural standard for Rule 60(d). *See* Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, 11 Federal Practice and Procedure § 2853 (2d ed. 1995). Interpreting an earlier version of Rule 60, the Third Circuit held that the identically worded "independent action" clause then located in Rule 60(b) allowed state-law claims for fraud outside the one-year time limit imposed by Rule 60(b)(3). *See Averback v. Rival Mfg. Co.*, 809 F.2d 1016, (3d Cir. 1987); *see also* Wright, Miller, and Kane, 11 Federal Practice and Procedure § 2868. Where vindicating a substantive state law right requires reversing the judgment, a federal court may do so in an independent action. *See Averback*, 809 F.2d 1016. In the memorandum disposition reversing this Court's

order dismissing Plaintiff's claims, the Ninth Circuit held:

> The statutory remedy of rescission is designed to restore the parties to where they were before entering the contract. Section 1692 of the California Civil Code provides that "[w]hen a contract has been rescinded in whole or in part . . . [t]he aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction . . . ." When one party is unable to restore the other party to its pre-contract position, § 1692 allows a court to "adjust equities a) that implicitly need adjustment, and b) that the parties have not already expressly adjusted by their contract." *Hedging Concepts Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1422, (Cal. App. 1996). Courts are empowered to adjust equities where necessary to "grant such relief as will achieve substantial justice under the circumstances of the case presented to it." *Snelson v. Ondulando Highlands Corp.*, 5 Cal. App. 3d 243, 258 (Cal. App. 1970). Indeed, courts should go as far as possible in restoring rescinding parties to their prior state of being. *See, e.g., Runyan v. Pacific Air Industries*, 2 Cal.3d 304, 316 (1970); *Gardiner Solder Co. v. Supalloy Corp.*, 232 Cal. App. 3d 1537, 1543-45, (Cal. App. 1991); *Bank of America v. Greenbach*, 98 Cal. App. 2d 220, 237-240 (Cal. App. 1950).
>
> The most obvious way to restore Kelly to his prior state of being would be to act as if the settlement had never happened and to let him pursue his bad-faith and breach-of-contract claims.

(Doc. # 55 at 4-6).[7] This Court concludes that if Plaintiff succeeds in convincing a jury that he is entitled to rescission, as a matter of state substantive law, awarding "complete relief" would require allowing Plaintiff to pursue his bad faith and breach of contract claims. *See* Cal. Civ. Code § 1692; *Averback*, 809 F.2d 1016.

### III.    Objections

In his Opposition, Plaintiff raised 29 objections to evidence Defendant filed in support of the motion. (Doc. # 143-6). Plaintiff also objected on due process grounds to additional evidence submitted by Defendant with Defendant's reply. (Doc. # 155). In addition to the objection to Dr. Ponton's declaration, Defendant objected to Anna Kelly's declaration, Dr. Gold's declaration, Plaintiff's counsel's declaration, and Plaintiff's declaration. (Docs. # 153-1, 153-2, 153-3, 153-4, 153-5, 153-6).   All objections to evidentiary materials cited in this Order are overruled. All objections to evidentiary materials not cited in this Order are denied as moot.

---

[7] The Court notes that the Ninth Circuit expressly declined to rule on the Rule 60 issue. However, in delineating the extent of the remedy required under state law, including tolling the statute of limitations, the Ninth Circuit's ruling is helpful in applying the principle explored in *Averback* that the Federal Rules of Civil Procedure do not override state-law substantive rights.

# CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Doc. # 106) is **DENIED**.   The parties shall contact the Magistrate Judge to schedule a status conference to set a schedule to complete discovery.

DATED:  August 12, 2010

**WILLIAM Q. HAYES**
United States District Judge