1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Richard Howard Kelly,

                           Plaintiff,

        v.

Provident Life and Accident Insurance
Company et als.,

                       Defendants.

Civil No.    04cv807-AJB(BGS)

**ORDER DENYING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**[Doc. No. 178.]**

Before the Court is Defendant Provident Life and Accident Insurance Company's ("Defendant" or "Provident") motion for partial summary judgment. (Dkt. No. 178.) Provident seeks summary judgment on the issues of the breach of the covenant of good faith and fair dealing (also characterized as insurance bad faith)[1] and punitive damages. Plaintiff Richard Kelly ("Plaintiff") filed an opposition on June 7, 2011, and Defendant filed a reply on June 21, 2011. After a review of the motion papers, supporting documents, and the applicable law, the Court **DENIES** Defendant's motion for partial summary judgment.

**Background**

Plaintiff, having purchased two disability income policies from Provident, filed a complaint alleging three claims: (1) rescission of an August 2001 settlement agreement ending prior litigation between the parties in this district; (2) breach of disability insurance contracts; and (3) breach of the implied covenant of good faith and fair dealing. (Dkt. No. 1.) Plaintiff also seeks punitive damages.

---

[1] Hungarter v. Provident Life and Accident Ins. Co., 373 F.3d 998, 1010 (9th Cir. 2004).

1  (Id.)  On August 13, 2004, District Judge William Q. Hayes granted Defendant's motion to dismiss

2  and dismissed Plaintiff's complaint with prejudice holding Plaintiff's breach of contract and bad

3  faith claims were barred by the statute of limitations and that Plaintiff's rescission claim failed to

4  allege sufficient facts to establish undue influence pursuant to Odorizzi v. Bloomfield Sch. Dist.,

5  246 Cal. App. 2d 123, 130 (1966).  (Dkt. No. 21.)  On October 16, 2007, the Court of Appeals for

6  the Ninth Circuit reversed the Court's decision in an unpublished memorandum disposition, holding

7  that the seven factors listed in Odorizzi were not the only factors which could support a claim for

8  rescission based on undue influence under California law.  (Dkt. No. 55 at 5.)  The Ninth Circuit

9  also held that if Plaintiff could establish that he is entitled to rescission, this Court should equitably

10  toll the statute of limitations on Plaintiff's breach of contract and bad faith claims.  (Id. at 7-8.)

11       On remand, Defendant filed an answer and the parties proceeded with discovery.  The

12  Magistrate Judge birfurcated discovery into two phases.  (Dkt. Nos. 70, 88, 93.)  The first phase was

13  limited to discovery on the rescission claim.  (See id.)  If Plaintiff's rescission claim survived

14  summary judgment, the parties would then conduct the second phase of discovery on Plaintiff's

15  breach of contract and bad faith claims.  (Id.)

16       On November 30, 2009, Defendants filed a motion for summary judgment on the rescission

17  claim.  (Dkt. No. 106.)  On August 12, 2010, District Judge Hayes issued an Order denying

18  Defendant's motion for summary judgment.  (Dkt. No. 106.)  Discovery proceeded as to the second

19  phase. On March 10, 2011, the case was transferred to the undersigned judge.  (Dkt. No. 173.)  On

20  April 25, 2011, Defendant filed a motion for partial summary judgment as to the claims for breach of

21  the implied covenant of good faith and fair dealing, and punitive damages.  (Dkt.  No. 178.)

22  Plaintiff filed an opposition on June 7, 2011.  (Dkt. Nos. 186-90.)  Defendant filed a reply on June

23  21, 2011.  (Dkt. No. 198.)

24                          **Factual Background**[2]

25       Defendant issued Plaintiff two "own-occupation" disability insurance policies in the early

26

27       [2]The Court recites the well-presented facts as presented in Judge Hayes' Order denying motion
28  for summary judmgnet filed on August 12, 2010.  (Dkt. No. 158.)  If a change in judges occur in a case,
the newly assigned judge may take judicial notice of all prior proceedings in this case.  See Santosky
v. Kramer, 455 U.S. 745, 786 n. 12 (1982) (concerning proceeding in Family Court).

1980s which provided a combined benefit of $5,500 per month. At the time he purchased the policies, Plaintiff sold insurance as a General Agent for General American Life Insurance Company. Pursuant to the disability policies, Plaintiff could claim total disability if he was unable "to perform the substantial and material duties of his occupation" and was "under the care and attendance of a Physician." In May of 1986, Plaintiff began seeing psychologist Russell Gold, Ph.D., who diagnosed Plaintiff with depression, dysthymic disorder, and schizoid personality disorder. Dr. Gold attributed Plaintiff's condition to stress from contentious divorce proceedings. Plaintiff filed a claim for complete disability in September of 1986. Defendant accepted the claim and began paying benefits. Plaintiff continued to see Dr. Gold for the thirteen-year period he received disability benefits from Defendant. In addition to paying benefits of $5,500 per month, in 1986 and 1987, Defendant paid Plaintiff's business expenses, such as rent for his office, salaries of employees, utilities, and accounting services.

While Plaintiff was on disability benefits, various insurance companies terminated their relationship with Plaintiff as an agent. In February of 1989, General American sent Plaintiff two letters warning him that his production for 1988 was insufficient and that if he failed to produce significantly higher commissions in 1989, his general agency would be terminated. General American again warned Plaintiff that he was in danger of losing his general agency in April of 1990. In April of 1990, Aetna sent Plaintiff a letter terminating Plaintiff's appointment as an agent because Plaintiff had recently done "little or no business activity with the Aetna Life Insurance Company . . . ." In November of 1992, General American "closed [Plaintiff's] General Agent contract . . . effective November 30, 1992." After Plaintiff's general agency was terminated, he could still write General American policies, but he had to go through the General Agent for his local area. In June of 1993, Jackson National Life informed Plaintiff that it would "be unable to renew [Plaintiff's] contract due to inactivity for the past twelve months." In October of 1994, Blue Shield of California terminated Plaintiff's agency because Plaintiff failed to meet "minimum production requirements."

Over the course of Plaintiff's disability claim, Defendant investigated Plaintiff's medical condition and whether Plaintiff had returned to work on multiple occasions. In February of 1990, Defendant stopped paying Plaintiff benefits for a six month period, stating in a letter to Plaintiff's

[07cv807-AJB(BGS)]

then attorney Harris Steinberg that Plaintiff failed to file his monthly claim forms.  Defendant stated

that it had "recently learned information which, in our opinion, shows that not only is Mr. Kelly not

totally disabled but, in fact, doing quite well and working in his occupation as an insurance agent."

Defendant stated it would resume payment of benefits "subject of course, to continued proof of

disability."  In response, Steinberg sent a letter which stated:

> Mr. Kelly is not involved in any current work activities.  As you know, Mr. Kelly is
> the principal in an insurance agency and has kept the agency open for purposes of
> collecting the renewal commissions which he is entitled to for work done in
> previous years on behalf of several different insurance companies.  Additionally the
> office is being kept open as a result of lease obligations on which Mr. Kelly has
> personal liability in addition to servicing the accounts of his prior customers. . .
> Mr. Kelly has not returned to work.  He did briefly attempt to resume some of his
> duties in February of this year, but found himself frustrated, stressed, and unable to
> resume his previous occupation and duties. . . . Mr. Kelly has, as a courtesy to
> existing clients, serviced isolated insurance accounts which required conversions of
> coverage from the term coverage to whole life coverage at the insured's request or
> in one or two instances [added] additional coverage [] to existing policies . . . .
>
> Mr. Kelly has advised me that Provident Life recently offered to pay him one-year's
> worth of disability benefits (60,000) to resolve his claim.  Please be advised that
> Mr. Kelly formally rejects this offer and wishes his benefits to continue as
> promised under the policy on a "monthly" basis for the remainder of his disability
>
> Lastly, while you pursue your "investigation" of this claim, I must insist that all
> monthly disability payments be made promptly and that all past monthly disability
> payments be brought current forthwith.

Enclosed with the letter, Steinberg sent over a hundred pages of business records showing Plaintiff's

transactions during the disability period.

In his declaration, Plaintiff states:

> Early in my disability, when I was first contacted by an existing client to make an
> adjustment to his insurance coverage, I contacted Provident at their local office.  I
> spoke to one of their representatives and explained the situation.  I explained that I
> was out on disability and was collecting benefits on an "own occupation" disability
> policy.  I asked if performing the limited work [of modifying an existing client's
> coverage, adding coverage, or switching to a new insurance type] would disqualify
> me for continued benefits.  I was told it was not. . . .  I have always been open and
> honest with Provident about the work I was doing.

Defendant also contacted Dr. Gold, seeking additional information about Plaintiff's

condition.  In the letter dated October 28, 1990, Defendant revealed it has covertly videotaped

Plaintiff's activities "over a period of four (4) separate days between May 23, 1990 and June 28,

- 4 -

1990" and sought Dr. Gold's explanation of "why [Plaintiff's] activities in the videotape make it appear that he leads a normal life and is not disabled." The letter also requested a list of "objective symptoms" of Plaintiff's psychological conditions. In a response dated February 6, 1991, Dr. Gold detailed the history of Plaintiff's case, described Plaintiff's difficulties with interacting with other people, particularly face to face, his social isolation, depression, excessive sleeping, abusive family background, and stress from his divorce, and concluded that Plaintiff "cannot perform a significant number of the usual and necessary responsibilities of an insurance agent." As to the videotape, Dr. Gold stated he does not "believe anything in the videotape contradicts the statements made herein." Gold notes Plaintiff "has always maintained the capacity to perform errands and menial daily functions in order to live autonomously. Had he ever not been able to function at this minimal level, he would have been hospitalized."

A report sent by the investigator to Defendant in June of 1990 shows that Plaintiff went to his insurance office once during the four days of surveillance. It is not clear how long Plaintiff remained in his office, because ten minutes after Plaintiff arrived at his office, Defendant instructed its private investigator "to terminate the investigation at this time since it did appear Mr. Kelly was at work." Plaintiff was also observed running errands and performing chores during the surveillance period.

In August 1990, Defendant resumed payments after receiving the letter from Steinberg. On December 11, 1990, Dr. Gold submitted a form to Defendant which stated Plaintiff's disability was "permanent and stationary." On April 3, 1991, Defendant asked Plaintiff to submit to an Independent Medical Examination ("IME") by Stephen Stahl, M.D., Ph.D., a psychiatrist and sought to send Plaintiff for psychological testing. Around the same time, Defendant offered to settle the disability claim for $200,000. Defendant rejected Plaintiff's counteroffer of $431,000. On June 7, 1991, Steinberg sent a letter to Defendant asserting further examination of Plaintiff would damage his psychological health and was unnecessary. However, Plaintiff did submit to the psychological testing on August 14, 1991, and the results were forwarded to Dr. Stahl on September 11, 1991. Dr. Stahl also examined Plaintiff.

Dr. Stahl's report concluded Plaintiff was suffering from dysthymia, or low-grade

- 5 -

depression, as well as "mixed personality disorder with schizoidal and passive aggressive features"

at the time of the examination and that Plaintiff had previously experienced a major depressive

episode brought on by his divorce which was then in remission.  Dr. Stahl concluded Plaintiff was

> temporarily totally disabled at the very least from November of 1990 until the time of my final evaluation on September 25, 1991.  Dating the exact onset of his temporary total disability is difficult because of the impossibility of getting reliable information from Mr. Kelly.  In the absence of better information, I would tend to rely on Dr. Gold's assessment and date the onset of total disability to be 1986, when Mr. Kelly stopped working.  Dating the recovery of total disability with return to the baseline state of partial long standing disability is clearer.  Mr. Kelly was already recovering notably from his major depression at the time of his first interview with me in May, 1991, but was still temporarily totally disabled.  By the time of his final interview, Mr. Kelly was no longer totally disabled.

> Mr. Kelly is currently able to perform the substantial and material duties of his usual occupation.  However, he has no interest in doing so.  In fact, hearing this opinion that he is able to work again will undoubtedly anger Mr. Kelly and could precipitate various hostile acts towards various parties including himself.  Mr. Kelly has made vague references to shooting himself if he does not get his own way, which is to continue totally disabled indefinitely.  Such implicit threats, however, do not change the objective assessment of temporary total disability, which are from 1986 to September 1991.

Id. at 76-78.

Despite this finding, Defendant continued to pay benefits.  John Kos, Director of Long Term Disability at Provident, states in his declaration that this was because Defendant learned that "Dr. Stahl had once been investigated . . . for an alleged impropriety in connection with a professional publication, Provident chose to forego any action based on Dr. Stahl's IME report.  Again, given the potential for questions regarding Dr. Stahl's credibility, Provident chose to give Kelly the benefit of the doubt."

In February of 1995, Provident informed Plaintiff that it had "recently completed a comprehensive review of your claim and have determined that it will only be necessary for you and your Attending Physician to complete an 'Insured's Supplementary Statement of Claim' form 4 times per year."  In 1997, however, "Provident . . . began another investigation."  Kos states the investigation revealed Kelly was still licensed to sell insurance and that he had income "for all but two years during the period from 1986 to 1996."  In May of 1997, Defendant also had a second IME with Dr. Alan S. Bergsma, M.D., a psychiatrist and additional psychological testing.

In his report dated May 27, 1997, Dr. Bergsma concluded that Plaintiff was suffering from

[07cv807-AJB(BGS)]

dysthymic disorder and a "mixed character disorder with schizoid features."  Dr. Bergsma concluded

that Plaintiff had previously suffered from a major depressive episode from 1986 through 1991

which was in remission at the time of the examination.  Dr. Bergsma states that the "diagnosis of

personality disorder refers to a chronic pattern of behaviors which interfere with his ability to

function socially and interpersonally [which] also affect his occupational behavior."  Dr. Bergsma

concluded that Plaintiff's

> mood disorder does not intrude into his life any more than it did when he was
> employed as an insurance salesman.  Similarly, his personality disorder with all of
> its difficulties is a baseline pattern of functioning which has been present
> throughout his adult lifetime.  There is no more reason to believe that it now would
> preclude him from functioning in his occupation of insurance salesman than it did
> in the past. . . . Returning to work as an insurance person would be difficult for Mr.
> Kelly now, just as it was in the past.  He was always more task than
> people-oriented.  His disability benefits enable him to avoid interpersonal stresses
> to a large degree.

Defendant continued to pay benefits after receiving this report.

In July of 1997, Defendant sent a field investigator, Lorenz E. Blochl, to Plaintiff's

residence.  Plaintiff refused to allow the investigator into his house and gave very short answers to

questions.  The investigator's report commented on Blochl's estimate of the price of Plaintiff's home

($600,000-$700,000), the landscaping, pool, and the make of a car in Plaintiff's garage (a

Mercedes). The report also noted that assets, including the house, cars, and Wobegone Enterprises, a

company Plaintiff founded, were held in Plaintiff's wife Anna's name, not his own name.  Blochl

interviewed Plaintiff's ex-wife Wanda, who stated Plaintiff threatened to go on disability if she filed

for divorce, that Plaintiff abused her, that Plaintiff went to Europe with another woman while on

disability, and that Plaintiff faked his depression.

Defendant also obtained business records from Plaintiff's former employer, General

American Life Insurance Company, which had allowed him to continue writing policies after

terminating his general agency in 1992.  The records provided by General American showed total

commissions by Plaintiff's company, Kelly Insurance Services, which changed its name to

Wobegone Enterprises in 1997, ranging from approximately $88,000 to $185,000 per year from

1991 through 1998.  Kos states these records "confirmed for the first time that Kelly was working,

and receiving income from activities other than mere 'renewals' and 'sporadic courtesy services'

during the entire period of his claimed disability." The records do not state how many transactions Kelly performed in these years or how these sales compare to other agents. A letter from General American in 1994 informs Plaintiff that as of October, Plaintiff had only met 2.8% of his yearly sales goals. Plaintiff states that over the course of the thirteen year period he received benefits, he sold 54 policies to 19 clients, "all but two [of whom] were clients that I had prior to going on disability." Plaintiff states "more than three-quarters of the first year commission income that I earned between 1991 and 1998 came from only one client, which was a client I had before my disability." After Plaintiff's general agency with General American was terminated in 1992 because of poor sales performance, he was assigned to the general agent for his geographical area, Thomas Gore. All of Plaintiff's work after 1992 went through Gore's office. Defendant also sent an inquiry to Gore, who stated in response that although he had a business relationship with Plaintiff for "7-8 years," he had "never met [Plaintiff] personally. We've only spoken by phone." Gore stated Plaintiff was generating "3-5 policy sales [per year]. Virtually all are repeat sales to existing customers." Gore stated he spoke to Plaintiff "[p]erhaps 10-12 times per year." Defendant received that letter on February 4, 1999.

In early 1999, Defendant also contacted other insurance companies which had relationships with Plaintiff prior to his disability claim. CPIC Life Insurance Company responded to Defendant's inquiries by stating Plaintiff and Wobegone Enterprises were on "Inactive Status," and that Plaintiff had not submitted any new business or earned any commissions since 1991. Safeco Life Insurance Company informed Defendant that Plaintiff and Wobegone were on inactive status and that Plaintiff's agency had been cancelled in April of 1993. In response to a similar inquiry, Executive Life Insurance informed Defendant that it had no record on file of Plaintiff and did not do any business with him. Guarantee Life Insurance also could not find any record of Plaintiff as an agent and stated that although Wobegone was an agent, "we also have no indication (on our records) that Wobegone Enterprises continues to be active with us." Massachusetts Casualty informed Defendant that Plaintiff had been on inactive status since January of 1985 and that it had never done business with Wobegone. Chubb Sovereign Life Insurance stated it had terminated Plaintiff as an agent in 1995 and had not done business with Wobegone.

1    Defendant did not contact Plaintiff's wife to determine her involvement in Wobegone

2    Enterprises.  In a declaration, Plaintiff's wife Anna Kelly states:

3        Shortly after we were married [in 1991], Richard gave me his company. . . .  Since
         1991, Richard's association with [the company] has been very limited due to
4        Richard's disability. . . . Prior to me obtaining my insurance license [in 2001],
         Richard maintained his license so that we could sell insurance to some of Richard's
5        old clients, and occasionally to an acquaintance of mine.

6

7        During the investigation, Blochl contacted the San Diego District Attorney's Office, the

8    United States' Attorney's Office, and the FBI to report insurance fraud.  A deputy district attorney

9    informed Blochl that "Mr. Kelly should be asked if he in fact has sold policies after his date of

10   disability and whether or not he has an office.  Very specific questions about sales, marketing, and

11   prospecting should be asked" and warned Blochl that "the questions on the Insured's Supplementary

12   Statement of Claim form were vague."  Defendants never asked Plaintiff these questions.   The

13   deputy district attorney also "suggested that the Insured should be examined under oath by Provident

14   attorneys regarding this claim.  She indicated that very specific questions about the insured['s]

15   alleged disability and possible insurance related activity should be explored."  Defendant never

16   conducted such an interview.  In his deposition, Blochl testified that when he investigated Plaintiff

17   and contacted various law enforcement agencies, he was unaware that Plaintiff had ever informed

18   Defendant that he was continuing to provide some services to existing clients, that he  was unaware

19   that Plaintiff's attorney had provided Plaintiff's business records to Defendant in 1990, and that he

20   was unaware that Plaintiff had informed Defendant that Plaintiff had initiated some new policies.

21   Blochl testified in his deposition that this information would have affected his determination of

22   whether fraud had been committed and that this information was the reason the FBI declined to

23   pursue the case after a preliminary investigation.

24       On March 9, 1999, Defendant informed Plaintiff that it was sending him for another IME.

25   On April 16, 1999, Dr. Alan Abrams, M.D., J.D., examined Plaintiff.  Dr. Abrams concluded that

26   Plaintiff has Narcissistic Personality Disorder with "additional features of other personality

27   disorders."  Dr. Abrams concluded that "[n]either Mr. Kelly's limited capacity for empathy or

28   deeper human relationship, nor other aspects of his personality disorders, are work disabling."  Dr.

     Abrams based his diagnosis in part on

[07cv807-AJB(BGS)]

other documents that strongly suggest that Mr. Kelly is both selling insurance policies, and running an insurance agency, and has been doing that throughout the period of disability, beginning in 1991.  It appears he might have been funneling income from Richard Kelly Insurance, Inc. [sic] through his present wife, Anna, to avoid reporting this income to Family Court.  If these documents in fact demonstrate that Mr. Kelly is working, this would confirm the conclusion of the two prior IME's that Mr. Kelly has not been disabled since at least 1991.

Dr. Abrams stated "I do not find evidence that Mr. Kelly was ever disabled by a mental illness, during the entire period of claimed disability" and that "[n]on-clinical elements, i.e. malingering, completely dominate the claim."  On August 18, 1999, Defendant sent Plaintiff a letter notifying him that it was terminating his benefits, although it would provide him with benefits through August 16, 1999, which was the date it concluded Plaintiff was not disabled.  The letter informed Plaintiff that he was required to pay his premiums in order to continue coverage under his policies.  Plaintiff sent a series of letters to Defendant after the termination and Dr. Gold also wrote to Defendant on Plaintiff's behalf.  In April of 2000, Defendant stated it was reviewing Plaintiff's submissions and would get back to him.  However, Defendant never responded.

In November of 2000, Plaintiff was served with process in Provident Life and Accident Insurance Co. v. Kelly, No. 00cv2169 H (JFS), the prior litigation before this Court.  Defendant Provident, as a plaintiff in that suit, alleged claims for fraud, conspiracy to defraud, breach of the covenant of good faith and fair dealing, rescission, and restitution against Kelly.  Defendant Provident also sued Kelly Insurance Services, Inc. and Wobegone Enterprises, Inc., alleging a cause of action for conspiracy to defraud.

Plaintiff attempted to retain his former attorney, Steinberg, to represent him and the companies, however, Steinberg told Plaintiff that he did not handle defense cases and advised Plaintiff to hire another attorney.  Plaintiff attempted to hire an attorney, but could not afford the fees and could not find an attorney who would take his case on a contingency basis because he was a defendant.  Plaintiff contacted Defendant, seeking a settlement, because Defendant had previously offered Plaintiff $330,000 to surrender the policies.  Defendant's attorney, Gregory Scarlett, told Plaintiff that he would put the lawsuit on hold while he looked into a settlement.

On April 11, 2001, Plaintiff learned that a clerk's default had been entered against him and

- 10 -

the companies and that Defendant was moving for default judgment.  Plaintiff, proceeding *pro se*, wrote a letter to Judge Huff explaining that he had not responded to the lawsuit because of his conversation with Defendant's attorney.  Plaintiff stated he believed the litigation was on hold.  In the letter, Plaintiff also stated that he did not own either of the corporate defendants, rather his wife Anna did.  At this time, Plaintiff was still under investigation by the FBI, which he found "tremendously upsetting . . . ."  Plaintiff did not understand how he could be accused of fraud because "Provident never asked for any additional information" about his "limited work" after Steinberg sent Defendant his work records in 1990.  Plaintiff states "I did not understand how I could lie about something I was never asked about."

Because Plaintiff was not an attorney, he could not file an answer or oppose default judgment on behalf of the corporate defendants, and Defendant obtained a default judgment.  Although Plaintiff's wife, not Plaintiff, was the registered agent for service of process, she was never served. Plaintiff's wife states in a declaration that the default judgment, "put a tremendous financial strain on Richard and I.  With Richard unable to work, I needed to make money to support us both.  I counted on the income from my insurance sales, including the residual commissions flowing through Wobegone, in order to make ends meet.  When Provident entered default against my company, it took away this source of income entirely."  After the default judgment, Plaintiff began drinking heavily.  Plaintiff's wife states that his condition worsened after Defendant cut off Plaintiff's disability benefits and during the lawsuit and that at one point, she discovered he had been researching suicide.  On July 2, 2001 and July 5, 2001, Plaintiff and Defendant's attorney attended an early neutral evaluation conference before the magistrate judge.  Plaintiff settled his case with Defendant, giving up his claim for disability benefits in exchange for Defendant agreeing to dismiss the lawsuit and "giving up its judgment against Anna's company."  The settlement agreement was signed by both parties on November 21, 2001.  Plaintiff states he signed the settlement agreement "because I did not have the mental or emotional capacity to engage in the conflictual situation that Provident had created.  I did not sign the agreement because it was what I wanted to do, but because I could not resist Provident's pressure."

Plaintiff submitted the declaration of Dr. Lynn Ponton, M.D., a Professor of Clinical

1   Psychiatry at the University of California, San Francisco, who reviewed Plaintiff's medical records

2   and the records of the three IMEs with Defendant's selected doctors.  Based on her review of the

3   records, Dr. Ponton offers her opinion that Plaintiff suffers from Avoidant Personality Disorder with

4   schizoid features.  Dr. Ponton states "Avoidant Personality Disorder is often characterized by shifts

5   in the level of avoidant behavior depending on the level of conflict associated with certain

6   interpersonal relationships."  Ponton states that Plaintiff's condition creates "undue susceptibility to

7   [] pressure," such as the pressure that Defendant's investigations, the prior lawsuit, and the

8   investigations of alleged insurance fraud by various law enforcement agencies would create.  Under

9   this pressure, given Plaintiff's diagnosis, "[h]is depression and social avoidance would have been at

10  an all-time high" at the time of the settlement.

11          Dr. Ponton also criticizes the three IME evaluations performed at Defendant's request.  Dr.

12  Ponton opines that the September 27, 1991 report by Dr. Stahl is deficient in that it finds

13          that Richard is no longer disabled after September 25, 1991, but provides no
            analysis of the substantial and material duties of Richard's occupation as an
14          insurance broker/general agent for General American – which includes extensive
            marketing and solicitation of new business – or why Dr. Stahl believes that Richard
15          can engage in those activities on a reasonably continuous basis.

16          As to Dr. Bergsma's 1997 conclusions, Dr. Ponton opines
17
18          I believe the more accurate diagnosis is Avoidant Personality Disorder with
            schizoid features. . . . [G]iven this more accurate diagnosis, I am critical of Dr.
19          Bergsma's opinion that Richard is not totally disabled from performing the
            substantial and material duties of his former occupation as an insurance agent
20          because he is at his affective baseline.  Due to the stress created by interpersonal
            difficulties, and the effect the stress has on Richard's dysthymic disorder – leading
21          to episodes of major depression – Richard's emotional state varies based on stress
            and conflict

22  and would worsen if Plaintiff returned to work.

23          Dr. Ponton criticizes Dr. Abrams's 1999 conclusions as well, noting Dr. Abrams used an

24  outdated test which had been performed on Plaintiff in 1986 rather than more recent psychological

25  testing performed in 1991.  Dr. Ponton notes that Dr. Abrams requested this testing from Defendant,

26  but Defendant never provided it.  Dr. Ponton opines that Dr. Abrams's conclusion that Plaintiff was

27  malingering was linked to his opinion that Plaintiff has Narcissistic Personality Disorder, which in

28  turn was based on flawed methodology and limited information.  Dr. Ponton notes that "Dr. Abrams

- 12 -                                                    [07cv807-AJB(BGS)]

seems to have completely ignored the valid results of the 1997 Millon Clinical Multiaxal

Inventory-III (MCMI-III)" in which "Richard scored on the very low end for narcissistic personality

pattern . . . ." Dr. Ponton opines this score "negates the diagnosis that Richard is suffering from

narcissistic personality disorder causing him to malinger." Dr. Ponton notes the same test supports

her conclusion that Plaintiff has Avoidant Personality Disorder based on other subscores. Further,

Dr. Ponton opines that Dr. Abrams's diagnosis "is centered on the presumption that Richard is

deceitful" and that Plaintiff had lied to Defendant about his work activities. Dr. Ponton continues

> [t]he letter from Harris Steinberg [which informs Defendant about Plaintiff's work activities] is conspicuously missing from the list of documents that Provident provided to Dr. Abrams. . . . Moreover, Dr. Abrams specifically asks Provident for additional information, including "Records from the General American Life Insurance Company covering 1986 to 1991"

which Defendant failed to provide.

### Discussion

In the instant motion, Defendant moves for partial summary judgment on the "bad faith"

claim and claim for punitive damages. As to bad faith, Defendant concedes that although there are

disputed issues of fact as to whether Plaintiff was totally disabled, there are no disputed issues of

fact as to the breach of the covenant of good faith and fair dealing because Provident's claim

decision was reasonable under the "genuine dispute" doctrine. It claims that because there was a

genuine dispute concerning coverage, there is no bad faith liability. In other words, even if

Provident's decision to deny Plaintiff benefits was a mistake, it does not constitute bad faith.

Provident also argues that the punitive damages claim is without merit. On the other hand, Plaintiff

argues that District Judge Hayes already made a determination in its prior order denying

Defendant's motion for summary judgment on the rescission issue that there were genuine issues of

material fact regarding whether Provident acted in "bad faith."

As to punitive damages, Defendants contends that Plaintiff has not shown evidence to

establish a finding of punitive damages. Plaintiff opposes arguing that he has presented evidence to

justify an award of punitive damages.

**A.    Prior Court Ruling on Motion for Summary Judgment on the "Bad Faith" Claim**

The prior motion for summary judgment filed on November 30, 2009 dealt with the claim of

[07cv807-AJB(BGS)]

rescission regarding the 1991 settlement ending prior litigation between the parties in this district. The key issue was whether the settlement agreement and general release were subject to fraud, duress or undue influence and therefore, subject to rescission.  As part of the analysis regarding whether there was undue influence, District Judge Hayes broadened the inquiry beyond the settlement negotiations and looked at whether Defendant took unfair advantage of Plaintiff's weakened state of mind during settlement of the case.  "The ultimate question is 'whether from the entire context it appears that [Plaintiff's] will was overborne.'"  (Dkt. No. 158 at 21 (citation omitted).)  This included Provident's investigation of the claim, its termination of Plaintiff's benefits, Defendant reporting to law enforcement agencies that Plaintiff had committed insurance fraud, and Defendant suing Plaintiff in the prior lawsuit.  (Id.)  The Court specifically addressed whether "there is sufficient evidence in the record, viewed in the light most favorable to Plaintiff, that a jury could find that Defendant acted in bad faith in its investigation and subsequent termination of Plaintiff's benefits . . . ."  (Id. at 22.)  After a thorough analysis and applying California law as to the issue of bad faith, Judge Hayes provided numerous instances where a reasonable jury could conclude that Defendant acted in bad faith.  (Id. at 21-25.)

The Court concluded "[t]here is evidence in the record which, viewed in the light most favorable to Plaintiff, could lead a jury to conclude that, despite knowing that Plaintiff was mentally ill, Defendant terminated Plaintiff's coverage in bad faith after conducting a biased investigation, contacted law enforcement agencies to instigate an investigation of Plaintiff for the purposes of harassment and sued Plaintiff for the return of all benefits without a valid basis for doing so in order to take unfair advantage of Plaintiff's weakness of mind."  (Id. at 25.)

Although not the main issue to be determined at the prior motion for summary judgment, the Court, in its holding, directly dealth with the issue of "bad faith" and determined that based on the record, there was a genuine issue of fact as to whether Provident acted in "bad faith" in investigating Plaintiff's claim and denying Plaintiff benefits.  (See id.)

"Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."  Richardson v. United States, 841 F.2d 993, 996 (9th Cir. 1988) (citations omitted).  Application of the law of the

case doctrine is discretionary and applies "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983); <u>Merritt v. Mackey</u>, 932 F.2d 1317, 1320 (9th Cir. 1991) (explaining that under the "law of the case doctrine," one panel of an appellate court will not reconsider questions which another panel has decided on a prior appeal in the same case). For the law of the case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" <u>United States v. Lummi Indian Tribe</u>, 235 F.3d 443, 452 (9th Cir. 2000) (<u>quoting</u> <u>Liberty Mut. Ins. v. EEOC</u>, 691 F.2d 438, 441 (9th Cir. 1982)). The doctrine was developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single, continuing lawsuit. <u>Ingle v. Circuit City</u>, 408 F.3d 592, 594 (9th Cir. 2005). However, the law of the case doctrine comes with some exceptions. A district court's decision to apply the doctrine will be deemed an abuse of discretion if "(1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." <u>Lummi Indian Tribe</u>, 235 F.3d at 452.

Here, Judge Hayes explicitly made a determination that there was a genuine issue of material fact as whether Defendant acted in "bad faith" in investigating Plaintiff's claim and subsequently terminating his benefits. Defendant has not provided any evidence or argument that the first decision was clearly erroneous; that an intervening change in the law occurred; that the evidence in the prior motion for summary judgment was substantially different; or that any other changed circumstances existed. <u>See</u> <u>Lummi Indian Tribe</u>, 235 F.3d at 452. Because District Judge William Q. Hayes already ruled on the issue of bad faith, the Court applies the law of the case doctrine and the Court DENIES Defendant's motion for partial summary judgment as to the breach of the covenant of good faith and fair dealing.

**B.     Punitive Damages**

Defendant argues that even if the Court denies summary judgment as to the bad faith claim, it can still grant summary judgment on the claim for punitive damages. Plaintiff contends that it has presented evidence of Provident's bad faith and malicious course of conduct to justify an award of

1  punitive damages.

2          Punitive damages may be awarded for tortious bad faith if the insurer was also guilty of

3  oppression, fraud, or malice.  Cal. Civ. Code § 3294.  The acts constituting malice, oppression or

4  fraud must be proven by clear and convincing evidence.  Jordan v. Allstate Ins. Co., 148 Cal. App.

5  4th 1062, 1080 (2007) (citing Cal. Civ. Code § 3294).  "Without tort liability, there can be no

6  liability for punitive damages."  Behnke v. State Farm Gen. Ins. Co., –Cal. Rptr. 3d – 2011 WL

7  2569290 (June 30, 2011).

8          The Court concludes that Provident is not entitled to summary adjudication of the claim for

9  punitive damages.  Plaintiff's claim for punitive damages is predicated on its claim for breach of the

10 covenant of good faith and fair dealing.  The Court has determined above that there are genuine

11 issue of material fact as to the "bad faith" claim.  At trial, if a jury makes a determination that

12 Provident denied Plaintiff's claim in bad faith, the trier of fact could also conclude that, in doing so,

13 Provident was guilty of malice, oppression or fraud.  Therefore, the Court DENIES Defendant's

14 motion for partial summary judgment as to punitive damages.

15                                  **Conclusion**

16         Based on the above, the Court **DENIES** Defendant's motion for partial summary judgment.

17 IT IS SO ORDERED.

18

19 DATED:  July 8, 2011

20                                      _____

21                                      Hon. Anthony J. Battaglia
                                        U.S. District Judge

22

23

24

25

26

27

28